**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**DUANE LEE FLUHARTY,**

   **Plaintiff,**

**v.**            **Case No.: 2:14-cv-25655**

**CAROLYN W. COLVIN,
Acting Commissioner of
Social Security,**

   **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable John T. Copenhaver, Jr., United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's brief requesting judgment on the pleadings, and the Commissioner's brief in support of her decision, requesting judgment in her favor. (ECF Nos. 12 & 15).

1

Having fully considered the record and the arguments of the parties, the undersigned United States Magistrate Judge respectfully **RECOMMENDS** that the presiding District Judge **GRANT** Plaintiff's request for a remand, (ECF No. 12); **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 15); **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g); and **DISMISS** this action from the docket of the Court.

## I.    Procedural History

Plaintiff, Duane Lee Fluharty ("Claimant"), filed an application for SSI on March 30, 2011, alleging a disability onset date of August 5, 2007, (Tr. at 19), due to "diabetes, rheumatoid arthritis of the knees, neck ... broken bone in the neck, nerve damage in the neck, back and right shoulder pain, lump found in waist, heart problems, herniated disc turned sideways, carpal tunnel." (Tr. at 214). The SSA denied Claimant's applications initially and upon reconsideration. (Tr. at 19). Claimant then filed a request for an administrative hearing, which was held on January 28, 2013 before the Honorable Jack Penca, Administrative Law Judge ("ALJ"). (Tr. at 39-76). By written decision dated March 13, 2013, the ALJ found that Claimant had not been under a disability, as defined in the Social Security Act, from August 5, 2007 through the date of the decision. (Tr. at 19-32). The ALJ's decision became the final decision of the Commissioner on July 16, 2014, when the Appeals Council denied Claimant's request for review. (Tr. at 1-4).

Claimant timely filed the present civil action seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 8, 9). Claimant filed a Brief in Support of Judgment on the

Pleadings, (ECF No. 12), and Defendant filed a Brief in Support of Defendant's Decision, (ECF No. 15), to which Claimant replied. (ECF No. 16). Therefore, the matter is fully briefed and ready for resolution.

## II.    Claimant's Background

Claimant was 46 years old at the time of alleged disability onset and 54 years old on the date of the ALJ's decision. (Tr. at 44). Claimant communicates in English. (Tr. at 213). He completed the eighth grade, subsequently obtained a GED, and joined the Navy. (Tr. at 54). Claimant was discharged from the Navy shortly after enlisting due to a knee impairment. (Tr. at 54-55). Claimant has prior relevant work experience as a cashier, stocker, restaurant steward, laborer, and dietary aid. (Tr. at 215).

## III.    Summary of ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c).

A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job; and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review

performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in the regulations. *Id.* §§ 404.1520a(c), 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation of extended duration) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree of functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental functional capacity. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The regulations specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The

> decision must include a specific finding as to the degree of limitation in
> each functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through March 31, 2014. (Tr. at 21, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since August 5, 2007, the alleged disability onset date. (Tr. at 21, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairment: "arthritis." (Tr. at 21-24, Finding No. 3). The ALJ considered Claimant's other alleged impairments, but found that his diabetes, neuropathy, hypertension, hyperlipidemia, carpal tunnel syndrome, dysfunctional gallbladder, major depressive disorder, decreased vision, and posttraumatic stress disorder were not severe. (*Id.*). In addition, the ALJ found that some of Claimant's ailments, including gastroesophageal reflux, sinusitis, otitis media, and respiratory infections, were transitory and, thus, did not exist for twelve continuous months as required by the applicable Social Security regulations. (*Id.*). Finally, the ALJ did not find an "appreciable" diagnosis of varicose veins in the medical records; accordingly, that alleged impairment was not medically determinable. (Tr. at 23).

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 24, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20
> CFR 404.1567(b) and 416.967(b) except he can occasionally climb ramps
> and stairs, but never ladders, ropes, and scaffolds. He can occasionally
> balance, stoop, kneel, crouch, and crawl. He must avoid concentrated

exposure to extreme cold, vibration, and hazards such as moving machinery and unprotected heights.

(Tr. at 24-30, Finding No. 5). At the fourth step, the ALJ determined that Claimant was unable to perform his past relevant work. (Tr. at 30, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in substantial gainful activity. (Tr. at 30-32, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1959, and was initially defined as a younger individual age 18-49, but subsequently changed category to closely approaching advanced age; (2) he had at least a high school education and could communicate in English; and (3) transferability of job skills was not an issue because Claimant's prior work was unskilled. (Tr. at 30-31, Finding Nos. 7-9). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that existed in significant numbers in the national economy, (Tr. at 31, Finding No. 10); including work as a price marker, routing clerk, nongovernmental mail clerk, sorter, retail order clerk, and surveillance system monitor. (*Id.*). Therefore, the ALJ concluded that Claimant was not disabled as defined in the Social Security Act, and was not entitled to benefits. (Tr. at 32, Finding No. 11).

## IV.  **Claimant's Challenges to the Commissioner's Decision**

Claimant raises two challenges to the Commissioner's decision. First, Claimant argues that the ALJ erred by affording no weight to the RFC assessments provided by his treating mental health care providers. (ECF No. 12 at 16-19). According to Claimant, the opinions of his psychiatrist, Dr. Worthington, and his psychologist/therapist, Dr. Gray, should have been afforded controlling weight; instead, the ALJ rejected the

opinions wholesale without giving the "good reasons" required by Social Security regulations and rulings. Second, Claimant asserts that the Appeals Council erred in failing to remand his case for consideration of new and material evidence. (ECF No. 12 at 12-16). Claimant contends that additional mental health records submitted to and considered by the Appeals Council identified important misconceptions of the ALJ, which resulted in his unwarranted rejection of the opinions of Claimant's treating mental health care providers.

At the outset, the Commissioner responds that Claimant cannot rely on the evidence submitted to the Appeals Council as a basis for remand, because the evidence is neither new nor material. (ECF No. 15 at 5-9). In addition, the Commissioner asserts that the ALJ properly weighed the opinions of Dr. Gray and Dr. Worthington, making clear that he rejected the opinions because they were not supported by the objective findings and by the evidence of Claimant's conservative treatment. (*Id.* at 9-11). The Commissioner adds that even if the ALJ made errors in weighing the opinions, Claimant is not entitled to remand given that he can show no prejudice. In the Commissioner's view, because the evidence does not support a finding of disability, remand is not appropriate.

## V.   Relevant Medical History

The undersigned has reviewed the transcript of proceedings in its entirety, including the medical records in evidence. The following summary relates to those records that are relevant to the issues raised by the parties.

### A. Treatment Records

On December 29, 2011, Claimant saw Dr. Kathryn Worthington, staff psychiatrist at Westbrook Health Services, for routine medication management. (Tr. at 708-09). She

listed Claimant's diagnoses as major depressive disorder, recurrent, moderate, and posttraumatic stress disorder. At that time, Claimant was taking Celexa, Minipress, and trazodone, but complained that his anxiety was still "off the chart." (Tr. at 708). He was particularly distressed over a friend his wife had made online. Claimant's mental status examination was normal, except that his mood was depressed and his affect was tense. Dr. Worthington decided to continue Claimant on his medications and add Klonopin to alleviate some of his anxiety.[1]

Claimant returned to Dr. Worthington on January 19, 2012. (Tr. at 710-11). He reported that Klonopin helped, but his mood was still depressed and he was having trouble sleeping. (Tr. at 710). Claimant continued to express concern with his wife's online relationships, indicating that she told one friend that she and Claimant were separated. Claimant's mental status examination was normal, except for his mood and affect. (Tr. at 711). Dr. Worthington decided to continue with the same medication regimen and see if Claimant's individual counseling sessions would help. (*Id.*).

On February 22, 2012, Claimant reported to Dr. Worthington that he was experiencing increased stress. (Tr. at 715). He described having less contact with his wife, as she spent more time talking with friends online. When Claimant asked his wife to spend time with him, without the computer, she refused. Claimant had a decreased appetite and poor sleep, indicating that he would go without sleep for a couple of days at a time. His mental status examination had not changed. (Tr. at 716). Dr. Worthington decided to keep Claimant on the same medications, but to increase his dosage of

---

[1] Based upon the comment in Dr. Worthington's notes that Claimant was being "followed for" his psychiatric diagnoses, (Tr. at 708), and Dr. Gray's letter indicating that Claimant had been a patient at Westbrook Health Services since July 6, 2011, (Tr. at 978), it is likely that the evidence of Claimant's mental health treatment is incomplete. Furthermore, it is likely that there are notes of Dr. Gray's therapy sessions with Claimant that were not produced by the facility.

Klonopin. (*Id.*). At his follow-up on March 21, 2012, Claimant's condition and concerns were essentially the same. (Tr. at 718-19). He continued to have erratic sleep habits, and his mood was "stressful." (Tr. at 718). Claimant's medications were continued. (Tr. at 719).

Claimant returned to Dr. Worthington's office on April 18, 2012 for routine medication management. (Tr. at 721-22). He advised Dr. Worthington that he and his wife had been working on their problems, and he learned that his jealousy was a little overblown. He indicated that his wife had discovered some things about her online friends, which were illuminating. Claimant reported sleeping "every other day." He described his mood as "up and down," although his mental status examination was otherwise normal. (Tr. at 721). Dr. Worthington decided to taper Claimant off Celexa and start him on Prozac. He was encouraged to continue with one-on-one counseling. (Tr. at 722).

On May 16, 2012, Claimant reported to Dr. Worthington that he was feeling "down," because he had not been able to see Dr. Gray, his therapist, for almost one month. (Tr. at 723).  He expressed concern with his wife's upcoming bariatric surgery, stating that he enjoyed cooking for her, and she would not be able to eat the same foods as before. He was also focused on his own mortality, and these thoughts were distressful. He described his sleep as "restless." (*Id.*). Claimant's mental status examination was essentially the same, and he was kept on the same medications, with encouragement to get counseling as quickly as he could. (Tr. at 723-24).

On June 13, 2012, Claimant presented to Dr. Worthington's office for routine medication management. (Tr. at 725-26). Claimant's mood was depressed, but he felt some better since being able to reconnect with his therapist. He reported being quite

10

upset about having to go without counseling for a month, and he had informed his therapist "that he could not have this happen again." (Tr. at 725). Claimant also described having issues with his mother, step-father, and grandfather. His grandfather, who was his mother's father, abused his mother and also abused Claimant when he was a child. According to Claimant, his grandfather broke Claimant's jaw when he was only five years old and continued to abuse him thereafter. Claimant's mental status examination was unchanged. Dr. Worthington made some alterations to Claimant's medications and instructed him to continue with counseling. (Tr. at 726). At the next session on July 11, 2012, Claimant's mood had improved and his problems were primarily physical. (Tr. at 727). Claimant's sleep patterns were still poor, but he was pleased with the progress he had made in counseling. (*Id.*).

On August 13, 2012, Claimant continued to feel some better. (Tr. at 729). He was busy caring for his wife after her surgery and was making headway with his mother, who was finally willing to talk about "situations," as long as he did not "say anything to anyone else." (*Id.*). Claimant's mental status examination was normal, except for his mood, which became depressed when he thought about his grandfather. (Tr. at 730). Claimant's medications remained the same. Not much had changed by Claimant's next appointment with Dr. Worthington. (Tr. at 732-33). He reported that his sleep was "okay;" "between the pain pills and other medications, he [was] getting sleep." (Tr. at 732). He complained some about his wife, family, and therapist, who was pushing him to discuss topics he did not want to address. Dr. Worthington maintained Claimant's medication regimen and encouraged him to continue with one-on-one counseling. (Tr. at 733).

On October 18, 2012, Claimant reported to Dr. Worthington that he was

beginning to have recurrent "bad dreams" again as he neared the anniversary of his grandfather's death. (Tr. at 735). He also indicated that his stepfather had Alzheimer's disease, and he was having a difficult time trying to support his mother "without compromising his personal beliefs." (*Id.*) Dr. Worthington made some medication changes to help Claimant with his nightmares and to improve mood stabilization. (Tr. at 736).

Claimant next presented to Dr. Worthington on November 13, 2012. (Tr. at 738-39). Dr. Worthington noted that Claimant's mood was variable, and he listed several current stressors, including the loss of his medical card and his wife's renewed contact with male friends on the internet. (Tr. at 738). Claimant admitted that he was not sleeping well. Dr. Worthington decided to keep Claimant on the same medications. (*Id.*). By the next session, Claimant was discussing the possibility of leaving his wife after he received Social Security disability and VA disability benefits. (Tr. at 741). He indicated that his wife had accepted a ring from an online male friend, and that was the last straw for Claimant. He still was not sleeping and his mood was described as poor. Dr. Worthington decided to add a trial of Abilify to Claimant's medication regimen to provide an adjunctive effect to his Prozac. (*Id.*).

On January 8, 2013, Claimant appeared for routine medication management. (Tr. at 985-86). Claimant was quite upset, stating that he needed a psychiatric evaluation for his Social Security disability hearing later in the month, but had not received one from Dr. Worthington or Dr. Gray. He was also angry with Dr. Gray, who allegedly "stood him up" on two occasions over the holidays, and with his wife, who continued to engage in a flirtation over the internet, despite his requests that she stop the behavior. (Tr. at 985). Claimant reported having nightmares, and his fear of the nightmares prevented him

from sleeping. Dr. Worthington observed that Claimant appeared upset and tense, and she thought it was unusual that he was beginning to grow a beard when he normally was clean-shaven. Dr. Worthington decided to increase Claimant's dose of Prozac and Minipress in an effort to improve his depression, decrease his irritability, and assist him in sleeping better. (Tr. at 985-86).

When Claimant returned on January 31, 2013, he reported that he had his hearing for Social Security disability and felt he would get a large settlement of back pay. (Tr. at 982-83). Claimant was still concerned about his wife's dalliance with the online friend and was anxious about financial issues. He reported getting no sleep. (Tr. at 982). Claimant's mental status examination was normal except for his "rollercoaster" mood and tense affect. In view of his anxiety, Dr. Worthington decided to add Wellbutrin to his medication regimen and keep the other medications as previously prescribed. (*Id.*).

On March 6, 2013, Claimant presented to Dr. Worthington's office for medication management. (Tr. at 980-81). He described having bad dreams and feeling depressed over his recent birthday and also over the delay by Social Security and the VA in reporting the results of his disability applications. He was concerned about finances, although he reported that his wife was paying the bills. His mood had been poor; and his appetite and sleep patterns were likewise poor. Claimant was continued on the same medications. (*Id.*).

### B. Evaluations and Opinions

On June 15, 2011, Cynthia Spaulding, M.A., Licensed Psychologist, performed an Adult Mental Status examination for the West Virginia Disability Determination Service. (Tr. at 560-64). Ms. Spaulding observed that Claimant arrived thirty minutes early for his appointment and was clean and suitably dressed. (Tr. at 560). Claimant's chief

complaints were diabetes, rheumatoid arthritis, broken neck bone with nerve damage, back and shoulder pain, lump found in the waist, heart problems, herniated disc, carpal tunnel syndrome, and depression. He stated that he never felt happy and was easily irritated. Claimant provided a significant history of childhood abuse at the hands of his grandfather and reported having nightmares and flashbacks. Claimant had no siblings and did not keep in contact with his extended family; however, he described having a good relationship with his wife of twenty-five years. (Tr. at 560-61). With respect to treatment history, Claimant indicated that he had never received mental health treatment, but did take Celexa prescribed by his family physician. In the past, Claimant had also taken Cymbalta and Zoloft. (Tr. at 561).

Claimant provided information regarding his educational and work history. He dropped out of the ninth grade, but subsequently obtained a GED. (Tr. at 562). Claimant took regular classes when in school and had no discipline problems, but he did not like school and did not want to attend. Claimant worked at various jobs in the past, including doing inventory for Walmart and Kmart, working as a steward at the Blennerhasset Hotel, and running a cash register at a convenience store. Claimant had a medical discharge from the Navy related to his knee.

Ms. Spaulding conducted a mental status examination of Claimant, noting that he was alert, oriented in all spheres, and had a broad and appropriate affect. (Tr. at 563). Claimant's eye contact was good; his speech was logical and coherent, and his remote, immediate, and recent memory was within normal limits. Claimant's attitude was cooperative, his judgment was normal, and his concentration and persistence were also normal. Claimant reported his social functioning to include attendance at church two times per week and grocery shopping when needed. He described a typical day as arising

at around 7:00 a.m., taking his medication, letting the dog out, preparing meals, cleaning, playing video games, and interacting with his wife. Ms. Spaulding diagnosed Claimant with major depressive disorder, recurrent, moderate, and posttraumatic stress disorder related to his childhood abuse. (*Id.*).

On July 1, 2011, Aroon Suansilppongse, M.D., a psychiatrist, completed a Psychiatric Review Technique form. (Tr. at 568-83). Dr. Suansilppongse determined that Claimant suffered from an affective disorder (mood disorder, not otherwise specified rule out posttraumatic stress disorder), which was not severe. (Tr. at 568, 582). She concluded that Claimant had mild limitations in activities of daily living, in maintaining social functioning, and in maintaining concentration, persistence, or pace. (Tr. at 573). Claimant had no episodes of decompensation of extended duration, and no evidence of paragraph C criteria. (Tr. at 573, 578). On September 28, 2011, Dr. Chester Frethiem, Psy.D, affirmed Dr. Suansilppongse's opinions.[2] (Tr. at 585).

On February 28, 2012, Dr. Loretto Auvil, a psychiatrist, completed a Physican's Summary for the Medical Review Team of West Virginia's Department of Health and Human Resources. (Tr. at 592-95). Dr. Auvil opined that Claimant was unable to work due to "his schizophrenia and bipolar ... neuropathy ... DM [diabetes mellitus]." (Tr. at 594). Dr. Auvil clarified that Claimant had borderline schizophrenia, borderline bipolar disease, and posttraumatic stress disorder. (Tr. at 595).

On December 28, 2012, Dr. Gray completed a Mental Assessment of Ability to do Work-Related Activities. (Tr. at 743-45). In the functional area of making occupational adjustments, Dr. Gray rated Claimant as having marked limitations in: relating to co-

---

[2] Dr. Frethiem provided an incorrect date for the Psychiatric Review Technique ("PRT") form that he affirmed; however, Dr. Suansilppongse's PRT form is the only one present in the record.

workers, dealing with the public, interacting with supervisors, and dealing with work stress. (Tr. at 744). A marked limitation was defined as a "serious limitation ... [t]he ability to function is severely limited." (Tr. at 743). Claimant also had moderate limitations in: following work rules, functioning independently and maintaining attention and concentration. (Tr. at 743-44). Dr. Gray explained that Claimant had "difficulty accepting divergent lines of reasoning." (Tr. at 744). In addition, Dr. Gray opined that Claimant had moderate impairments in making performance adjustments; specifically, in his ability to understand, remember, and carry out anything more than simple job instructions. According to Dr. Gray, Claimant had average intellectual functioning, but due to his psychopathology, he demonstrated cognitive limitations. (*Id.*). In the category of making personal social adjustments, Dr. Gray rated Claimant as markedly limited in the ability to behave in an emotionally stable manner and relate predictably in social situations. (Tr. at 745). He was moderately limited in his ability to complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without unreasonable rest periods. Dr. Gray added that Claimant had a rigid belief system and was often intolerant of those who disagreed with him, leading to "aggressive and inappropriate verbalization in quality and quantity of speech." (*Id.*). Dr. Gray also felt that Claimant's physical problems would interfere with his ability to work. (*Id.*).

On January 13, 2013, Dr. Worthington completed a Mental Assessment of Ability to do Work-Related Activities. (Tr. at 816-18). In the functional area of making occupational adjustments, Dr. Worthington rated Claimant as having marked limitations in interacting with supervisors and dealing with work stress. (Tr. at 817). Claimant had moderate limitations in: relating to co-workers, dealing with the public,

using judgment, and functioning independently. She felt that in the category of making performance adjustments, Claimant was moderately impaired in all functions. (Id.). Finally, in the category of making personal social adjustments, Dr. Worthington rated Claimant as markedly limited in the ability to relate predictably and moderately impaired in his ability to behave in an emotionally stable manner. (Tr. at 818). Dr. Worthington did not provide an explanation or point to medical findings in the record to support her ratings.

On April 2, 2013, after the ALJ's decision was issued, Dr. Gray wrote a summary of Claimant's treatment history. (Tr. at 978-79). Dr. Gray indicated that since July 6, 2011, he had seen Claimant a total of 36 times with each session lasting approximately one hour. He added that over the 21-month period that Claimant had been his patient, the last 19 months consisted of intensive outpatient counseling. Dr. Gray stated that Claimant's working diagnoses included generalized anxiety disorder; posttraumatic stress disorder; and major depressive disorder, recurrent, moderate. None of the diagnoses had changed, remitted, or otherwise been resolved during treatment. (Tr. at 978). In Dr. Gray's opinion, Claimant's symptoms were long-standing in nature and did not "suggest the realistic potential for remission beyond non-consistent wax and wane of degree of severity." (Id.). According to Dr. Gray, Claimant's personality contained "cluster B and cluster C traits that one would equate with Borderline Personality Disorder and Antisocial Personality Disorder," and these traits were the consequence of his abusive childhood. (Id.) In light of Claimant's personality traits, Dr. Gray opined that Claimant would not be able to "successfully interface in the work place." (Tr. at 979). He felt Claimant would function best in a "self-sustaining, essentially solitary environment that allows for avoidance of typical life stressors associated with daily life requirements

17

involving the general public." (*Id.*).

## VI.   <u>**Standard of Review**</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the record and determine whether it is adequate to support the conclusion of the Commissioner. *Hays*, 907 F.2d at 1456. When conducting this review, the Court does not re-weigh evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001) (citing *Hays*, 907 F.2d at 1456)). Moreover, "[t]he fact that the record as a whole might support an inconsistent conclusion is immaterial, for the language of § 205(g) ... requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" *Blalock*, 483 F.2d at 775 (citations omitted). Thus, the relevant question for the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig*, 76 F.3d at 589).

## VII.   __Discussion__

As earlier stated, Claimant contends that the assessment of his mental impairments by the ALJ was flawed, and the Appeals Council compounded the error by denying Claimant's request for review. Having considered the record, the undersigned agrees with Claimant for several reasons. First, the ALJ's finding at step two of the sequential disability determination process that Claimant's mental impairments were non-severe is not supported by substantial evidence. According to the applicable regulations, an impairment or a combination of impairments is severe when it significantly limits a claimant's physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1520(c), 416.920(c). In making his step two finding, the ALJ relied largely upon Claimant's Function Reports to assess the severity of his mental impairment. The ALJ did not address the RFC assessments provided by Dr. Gray and Dr. Worthington, or reconcile those assessments with his contradictory conclusion. Clearly, the ALJ failed to comply with the requirements of 20 C.F.R. §§ 404.1520a(c)(1), 416.920a(c)(1), which provide:

> Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues *and all relevant evidence* to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment.

(*Id.*) (emphasis added); *See Salmon v. Colvin,* No. 1:12CV1209, 2015 WL 1526020, at *3 n. 1 (M.D.N.C. Apr. 2, 2015) (confirming that ALJ should address medical opinions at step two of the process). An error at the second step of the process does not necessarily require reversal and remand; particularly, if the disability assessment proceeds to step

three and the error is subsequently rectified. *See Hammond v. Astrue,* Civil Action No. TMD 11–2922, 2013 WL 822749, at *2 (D.Md. Mar. 5, 2013) ("When an ALJ erroneously finds an impairment to be non-severe at step two, there is no prejudice to the claimant if the ALJ sufficiently considers the effects of that impairment at subsequent steps."). On the other hand, an incorrect finding at step two may require reversal and remand when the ALJ overlooks, or fails to consider, the effects of the non-severe impairment, because "'all of a claimant's impairments must be considered in combination at steps three, four and five.'" *Id.* at *3 *(citing Schoofield v. Barnhart,* 220 F.Supp.2d 512, 518 (D.Md.2002)). Here, the ALJ never remedied his initial error. To the contrary, he essentially dismissed Claimant's allegations of mental impairments.

Second, the ALJ erred in his treatment of the medical source opinions regarding Claimant's mental impairments.  The ALJ gave great weight to the July 2011 PRT form prepared by Dr. Aroon Suansilppongse, an agency consultant who did not examine or treat Claimant, and to the Case Evaluation of Dr. Chester Frethiem, who affirmed Dr. Suansilppongse's opinions. (Tr. at 29). Of note, Dr. Suansilppongse and Dr. Frethiem provided their evaluation and affirmation before any evidence of Claimant's mental health treatment was in the record; therefore, the record relied upon by Dr. Suansilppongse and Dr. Frethiem in reaching their opinions was not the same record before the ALJ in March 2013 when he issued his written decision. At the time Dr. Suansilppongse found that Claimant had a non-severe "mood disorder, NOS, rule out posttraumatic stress disorder," the record contained only one examination by a consulting psychologist and some history that Claimant was taking Celebrex and had taken Zoloft and Cymbalta in the past. (Tr. at 561, 568, 574, 582). In contrast, by the time of the written decision nearly two years later, Claimant had firm diagnoses of major

depressive disorder, recurrent, moderate, and posttraumatic stress disorder; had been receiving intensive outpatient therapy for well over one year, as well as regular medication management by a psychiatrist; and had supplemented the file with recent mental RFC assessments prepared by two treating sources, both of whom opined that Claimant had moderate to marked limitations in multiple mental work-related functions. (Tr. at 743-45, 816-18). Despite the significant differences in the case file between September 2011 and March 2013, the ALJ did not submit the later treatment information to Dr. Suansilppongse, Dr. Frethiem, or any other mental health consultant, to obtain an updated evaluation. Consequently, the ALJ improperly based his assessment of the functional impact of Claimant's mental impairments on opinions that did not take into account key medical evidence.

The undersigned emphasizes that while the weight of an agency consultant's opinion does not rest solely upon the date that the opinion was issued, relying chiefly on an opinion given prior to significant changes in a claimant's condition or treatment may constitute error for the simple reason that the opinion is not based upon a fair consideration of all of the key evidence. *See Fraley v. Astrue*, 2:10-CV-00762, 2011 WL 2681647, at *7 (S.D.W.Va. July 11, 2011) (finding that ALJ erred in relying on state agency medical source opinion formed before "key medical evidence" related to claimant's impairments was available); *see, also, Starcher v. Colvin*, No. 1:12-01444, 2013 WL 5504494, at *7 (S.D.W.Va. Oct. 2, 2013). In *Starcher*, the court further explained that "because state agency review precedes ALJ review, there is always some time lapse between the consultant's report and the ALJ hearing and decision. The Social Security regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it. *Only where 'additional medical evidence is received*

that in the opinion of the [ALJ] ... may change the State agency medical ... consultant's finding' ... is an update to the report required." *Id.* (quoting *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011)) (emphasis added) (ellipses and brackets in original). Consequently, when reviewing a final decision that is based primarily upon an early-issued medical source statement, the court must examine the record to determine if after-acquired medical evidence might reasonably alter the medical source's findings, and thus require an updated evaluation.

In addition to the opinions of Dr. Suansilppongse and Dr. Frethiem, the ALJ examined the statements of three mental health specialists, including two treating sources and one examining consultant.[3] The ALJ gave partial weight to a February 2012 opinion of Dr. Loretto Auvil, a psychiatrist who examined Claimant on one occasion at the request of the West Virginia Department of Health and Human Services. (Tr. at 29). Dr. Auvil performed a physical examination and mental health assessment, and diagnosed Claimant with diabetes mellitus, hypertension, neuropathy, rheumatoid arthritis, borderline schizophrenia, borderline bipolar disease, and posttraumatic stress disorder. (Tr. at 592, 594). He opined that Claimant's diabetes, neuropathy, and mental health conditions prevented him from working. (Tr. at 594-95). The ALJ accepted Dr. Auvil's opinions regarding Claimant's physical health, but entirely rejected his conclusion that Claimant was disabled "secondary to mental health symptoms." (Tr. at 29).

Although the ALJ was certainly entitled to accept a portion and reject a portion of Dr. Auvil's opinions, the ALJ provided an inadequate explanation of the reasons why

---

[3] The ALJ did not mention the examination performed by Cynthia Spaulding, M.A., the agency consultant who examined Claimant.

certain opinions by Dr. Auvil were entitled to more or less weight. For example, the ALJ rejected the psychiatric diagnoses reached by Dr. Auvil on the ground that Claimant's mental health treatment records did not support Dr. Auvil's diagnoses. (Tr. at 29). Notably, the ALJ did not specify which medical records refuted the diagnoses. Nonetheless, while this explanation is arguably sufficient with respect to Dr. Auvil's diagnoses of schizophrenia and bipolar disorder, it does not address posttraumatic stress disorder, a condition with which Claimant's treating mental health care providers repeatedly diagnosed him. In addition, Ms. Spaulding, an examining consultant, diagnosed Claimant with posttraumatic stress disorder, (Tr. at 563), and Dr. Suansilppongse included "rule out" posttraumatic stress disorder as part of her assessment. Consequently, this diagnosis by Dr. Auvil was well-supported in the record. Moreover, the ALJ explicitly discounted Dr. Auvil's diagnoses on the ground that "the claimant has been noted with average intellect in the record." (Tr. at 29). Given that an individual's intelligence quotient is not a diagnostic criterion for schizophrenia, bipolar disorder, or posttraumatic stress disorder, this reason is nonsensical and suggests that the ALJ conducted a hasty and superficial review of the mental health records. Finally, the ALJ afforded "significant weight" to Dr. Auvil's "opinion on physical health as she [*sic*] found the claimant's speech, sight, hearing, posture, and gait were all normal." (*Id.*). However, the ALJ provided no specific reason as to why those particular findings were entitled to significant weight, when Dr. Auvil's psychiatric findings were not entitled to any weight. (Tr. at 29). The ALJ's decision to give more weight to Dr. Auvil's physical examination than to his psychiatric assessment is especially perplexing when considering that Dr. Auvil's specialty is psychiatry. In the end, the ALJ's discussion of Dr. Auvil's evaluation leaves the impression that the ALJ simply cherry-picked those

portions of Dr. Auvil's report that were supportive of the ALJ's final decision.

The ALJ also rejected the opinions of Michael Gray, Ed.D., Claimant's supervised psychologist/therapist at Westbrook Health Services, and Kathryn Worthington, M.D., Claimant's treating psychiatrist. In late 2012 and early 2013, Dr. Gray and Dr. Worthington, respectively, submitted mental RFC assessment forms, rating the extent to which Claimant was limited in his ability to perform certain work-related functions. (Tr. at 29-30). The ALJ explained that Dr. Gray's opinions were not worth *any* weight, because the evidence did not corroborate that Dr. Gray treated Claimant. (Tr. at 30). In addition, the ALJ gave no weight to the opinions of both Dr. Gray and Dr. Worthington on the basis that they were inconsistent with the record, stressing that the mental health evidence reflected only "minor problems," and there was "no documentation of severe symptoms of sleep disturbance or bad dreams to the degree testified by the claimant." (*Id.*). The ALJ also pointed out that Claimant's affect was documented as euthymic at a December 2012 mental status examination by Dr. Worthington; Claimant received only conservative and routine medication management; and Claimant never required hospitalization for mental health issues. (*Id.*).

In regard to the ALJ's first reason for disregarding Dr. Gray's opinions, the subsequent documentation supplied by Claimant confirmed that Dr. Gray had treated Claimant for twenty-one months, the last nineteen months involving intensive outpatient counseling, and Claimant's treatment was ongoing. (Tr. at 978-99). According to Dr. Gray, he had provided therapy to Claimant on a monthly or bi-monthly basis beginning in July 2011; by April 2, 2013, he had seen Claimant a total of thirty-six times, and each session lasted one hour. Therefore, the record does not support the first ground cited by the ALJ for rejecting Dr. Gray's opinions.

As to the ALJ's next reason for rejecting both Dr. Gray's and Dr. Worthington's opinions—that being, that Claimant's records showed only minor psychological problems—the evidence again undermines the ALJ's position. Both Dr. Gray and Dr. Worthington diagnosed Claimant with major depression and posttraumatic stress disorder and documented the historical basis of the diagnoses. In addition to these diagnoses, Dr. Gray opined that Claimant had personality traits consistent with borderline personality disorder and antisocial personality disorder. (Tr. at 978). These traits substantially affected Claimant's ability to "function with others in a prosocial, appropriate manner" and when under stress, Claimant could potentially respond with "aggressive, antisocial, and confrontational" behaviors.  (Tr. at 979). Dr. Gray also advised that Claimant had a rigid belief system, which made him intolerant of others and led to "inappropriate verbalization" when people disagreed with him. (Tr. at 745). Indeed, Claimant reported having been fired from his job at the Blennerhasset Hotel due to disagreements with his supervisor and co-workers. (Tr. at 53-54, 240). Dr. Gray believed that Claimant should be allowed to function "in a self-sustaining, essentially solitary environment" to avoid "typical life stressors." (Tr. at 979).[4] Notations in Dr. Worthington's chart likewise provide glimmers of the personality disorders referenced by Dr. Gray. For example, Dr. Worthington noted that Claimant was "bumping heads" with his therapist about what needed to be discussed, (Tr. at 732); that when Claimant could not get an appointment with his therapist for a month, he was quite agitated and demanding, informing his therapist that "he could not have this happen again," and he would go to someone else if it did happen, (Tr. at 725); that Claimant refused to say

---

[4] Some of these opinions are contained in the letter written by Dr. Gray after the ALJ's decision. Nevertheless, given that the letter was accepted into evidence by the Appeals Council, the Court considers the ALJ's decision in light of "the record as a whole," which includes the letter. *See Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011)

anything nice about his grandfather even when urged to do so by his therapist, (*Id.*); that Claimant was "quite upset" with his therapist, who "stood him up" over the holidays, (Tr. at 985); and that Claimant "[saw] everything as black and white." (Tr. at 982).

The ALJ's conclusion that the documentation did not support Claimant's testimony regarding nightmares and disturbed sleep is likewise faulty. The records reflect that out of sixteen office visits with Dr. Worthington, Claimant complained of no sleep, inadequate sleep, or sleep disturbed by bad dreams on fourteen occasions. (Tr. at 708, 710, 715, 718, 721, 723, 725, 727, 729, 735, 738, 741, 980, 982, 985). At one of the two remaining visits, Claimant reported that his ability to sleep had improved, but the improvement was attributed to a combination of pain and psychotropic medications taken by Claimant at bedtime. (Tr. at 732). At that time, Claimant was prescribed four psychiatric medications, which included Minipress, trazodone, and Klonopin, all of which were taken daily at bedtime. (*Id.*). In addition to Dr. Worthington's records of sleep impairment and bad dreams, Claimant reported to Ms. Spaulding during the June 2011 consultative examination that he had nightmares and flashbacks related to the years of abuse he suffered at the hands of his violent grandfather. (Tr. at 560). Accordingly, the documentation prepared by Claimant's mental health care providers actually substantiates Claimant's testimony, rather than contradicting it. Furthermore, while Claimant's affect was euthymic at his December 2012 visit, as highlighted by the ALJ, Claimant's affect was also frequently described as tense, and his mood was generally described as depressed or "up and down." (Tr. at 708, 711, 716, 719, 721, 723, 725, 733, 736, 738, 741, 980, 982, 985).

Lastly, the ALJ rejected all of Dr. Gray's and Dr. Worthington's opinions detailing

Claimant's functional limitations on the ground that Claimant's treatment was conservative and did not include any hospitalizations. The ALJ's apparent belief that a claimant must receive inpatient psychiatric care in order to have moderate or marked limitations of function lacks any legal, medical, or factual foundation. Certainly, Claimant had no history of inpatient psychiatric care. Nonetheless, he required intensive monthly to bi-monthly individual counseling sessions and multiple concurrent psychotropic medications to treat his symptoms. Despite treatment, both Dr. Gray and Dr. Worthington opined that Claimant had moderate to marked limitations in several specific areas of work-related functioning. The ALJ failed to provide any focused explanation as to why those function-by-function findings should have been entirely disregarded. Instead, contrary to Social Security regulations and rulings, the ALJ supplied a broadly-brushed rejection of the RFC assessments of Claimant's treating mental health care sources.

In keeping with relevant regulations and rulings, when evaluating a claimant's application for disability benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. §§ 404.1527(b), 416.927(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* §§ 404.1527(a)(2), 416.927(a)(2). Title 20 C.F.R. §§ 404.1527(c), 416.927(c) outline how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits. In general, an ALJ should give more weight to the opinion of an examining medical source

27

than to the opinion of a non-examining source. *Id.* §§ 404.1527(c)(1), 416.927(c)(1). Even greater weight should be allocated to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *Id.* §§ 404.1527(c)(2), 416.927(c)(2). Indeed, a treating physician's opinion should be given ***controlling*** weight when the opinion is supported by clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence. *Id.* If the ALJ determines that a treating physician's opinion is not entitled to controlling weight, the ALJ must then analyze and weigh all the medical opinions of record, taking into account certain factors listed in 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6)[5] and must explain the reasons for the weight given to the opinions.[6] "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected ... In many cases, a treating source's opinion will be entitled

---

[5] The factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors bearing on the weight of the opinion.

[6] Although 20 C.F.R. §§ 404.1527(c), 416.927(c) provides that in the absence of a controlling opinion by a treating physician, all of the medical opinions must be evaluated and weighed based upon various factors, the regulation does not explicitly require the ALJ to recount the details of that analysis in the written opinion. Instead, the regulation mandates only that the ALJ give "good reasons" in the decision for the weight ultimately allocated to medical source opinions. *Id.* §§ 404.1527(c)(2), 416.927(c); *see also* SSR 96-2p, 1996 WL 374188, at *5 (stating that when a decision is not fully favorable, "the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."). This Court has held that "while the ALJ also has a duty to 'consider' each of the ... factors listed above, that does not mean that the ALJ has a duty to discuss them when giving 'good reasons.' Stated differently, the regulations require the ALJ to consider the ... factors, but do not demand that the ALJ explicitly discuss each of the factors." *Hardy v. Colvin,* No. 2:13–cv–20749, 2014 WL 4929464, at *2 (S.D.W.Va. Sept. 30, 2014).

to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *4. Nevertheless, a treating physician's opinion may be rejected in whole or in part when there is persuasive contrary evidence in the record. *Coffman v. Bowen,* 829 F.2d 514, 517 (4th Cir. 1987). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456.

In this case, the ALJ failed to identify "persuasive contrary evidence" in the record to justify his rejection of Dr. Gray's and Dr. Worthington's opinions in their entirety. In fact, the ALJ did not point to any particular evidence to support the lack of weight he gave to the opinions, even though they were generated by Claimant's treating psychologist and psychiatrist. As previously stated, the ALJ justified his rejection of the opinions with nonspecific, conclusory, and generalized statements.

For many of the same reasons stated above, the Appeals Council erred by not remanding the case to allow the ALJ to address his mistakes; particularly, in light of Dr. Gray's letter, which eliminated one major reason given by the ALJ for his decision to give no weight to Dr. Gray's RFC assessment.[7] However, as the Commissioner stresses, even assuming that both the ALJ and the Appeals Council erred, mistakes in the disability determination process do not always justify reversal and remand. If the errors are harmless, then remand is not appropriate. As the Commissioner explains, "[a] court should affirm the Commissioner's decision, even when there is error, if there is 'no

---

[7] To the extent Claimant argues that the Appeals Council should have provided a more detailed explanation of its reasons for affirming the ALJ's opinion despite the new and material evidence, the undersigned agrees with the Commissioner that Claimant's argument is without merit. The Fourth Circuit Court of Appeals has explicitly held that the Appeals Council is not required to provide an analysis of new and material evidence in it denial of review. *Meyer v. Astrue,* 662 F.3d at 704.

question that [s]he would have reached the same result notwithstanding [the] initial error.'" (ECF No. 15 at 10) (*quoting Mickles v. Shalala,* 29 F.3d 918, 921 (4th Cir. 1994)).

Courts have routinely applied a harmless error analysis to administrative decisions that do not fully comport with the procedural requirements of the agency's regulations, but for which remand "would be merely a waste of time and money." *See, e.g., Jenkins v. Astrue,* 2009 WL 1010870 at *4 (D.Kan. Apr. 14, 2009) (citing *Kerner v. Celebrezze,* 340 F.2d 736, 740 (2d Cir. 1965)). The Fourth Circuit has employed a similar analysis in the context of Social Security disability determinations. *See Morgan v. Barnhart,* 142 F.App'x 716, 722–23 (4th Cir. 2005) (unpublished); *Bishop v. Barnhart,* 78 F.App'x 265, 268 (4th Cir. 2003) (unpublished). In general, remand of a procedurally deficient decision is not necessary "absent a showing that the [complainant] has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." *Connor v. United States Civil Service Commission,* 721 F.2d 1054, 1056 (6th Cir. 1983); *Burch v. Astrue,* 2011 WL 4025450, at *6 (W.D.N.C July 5, 2011) (*citing Camp v. Massanari,* 22 F.App'x 311 (4th Cir. 2001)) (holding that a claimant must show that, absent error, the decision might have been different). In other words, procedural errors are harmless when they do not substantively prejudice the claimant. *See Mascio v. Colvin,* 780 F.3d 632, 639 (4th Cir. 2015) (finding that an ALJ's error in assessing a claimant's credibility after, instead of before, determining his RFC was be harmless so long as the ALJ conducted a proper credibility assessment); *Tanner v. Comm'r of Soc. Sec.,* No. 14–1272, 602 F.Appx. 95, 101 (4th Cir. 2015) (finding an ALJ's error to be harmless where it was "highly unlikely, given the medical evidence of record, that a remand to the agency would change the Commissioner's finding of nondisability"); *Austin v. Astrue,* No. 7:06–CV–00622, 2007

WL 3070601, *6 (W.D.Va. Oct. 18, 2007) ("[E]rrors are harmless in social security cases when it is inconceivable that a different administrative conclusion would have been reached absent the error") (citing *Camp,* 22 F. App'x at 311). In order for a reviewing court to find an error harmless, the court must be able to plainly see from the ALJ's written decision, or from the evidence as a whole, that any prejudicial effect of the ALJ's mistake was, in some way, cured, so that the final determination of nondisability is supported by substantial evidence. If the final decision is not adequately supported, the court must reverse the Commissioner and, if necessary, remand the matter for further proceedings.

A court may remand the Commissioner's decision for a rehearing under sentence four or sentence six of 42 U.S.C. § 405(g). A sentence six remand "may be ordered in only two situations: (1) where the Commissioner requests remand before answering the complaint, or (2) where new, material evidence is adduced that was for good cause not presented before the agency." *Snider v. Colvin,* Civil Action No. 6:12-cv-00954, 2013 WL 4880158, at *4 (S.D.W.Va. Sept. 12, 2013) (*citing Shalala v. Schaefer,* 509 U.S. 292, 297, n.2 (1993)). In contrast, a sentence four remand is appropriate when the Commissioner's decision is not supported by substantial evidence, the Commissioner incorrectly applies the law in reaching the decision, or the basis of the Commissioner's decision is indiscernible. *See Brown v. Astrue,* Case No. 8:11–03151–RBH–JDA, 2013 WL 625599 (D.S.C. Jan. 31, 2013) (citations omitted).

If new and material evidence is submitted to the Appeals Council after the ALJ's decision, the Appeals Council:

> shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision. The Appeals Council shall evaluate the entire record including the new and

> material evidence submitted if it relates to the period on or before the date
> of the administrative law judge hearing decision. It will then review the
> case if it finds that the administrative law judge's action, findings, or
> conclusion is contrary to the weight of the evidence currently of record.

20 C.F.R §§ 404.970(b), 416.1470(b). Evidence is new when it is not "duplicative or

cumulative," and is material "if there is a reasonable possibility that the new evidence

would have changed the outcome." *Wilkins v. Secretary, Dep't of Health and Human*

*Servs.,* 953 F.2d 93, 96 (4th Cir. 1991) *superseded by statute on other grounds.* When

the Appeals Council incorporates new and material evidence into the administrative

record, and nevertheless denies review of the ALJ's findings and conclusions, the

inquiry before the reviewing court is whether the Commissioner's decision is supported

by substantial evidence in light of "'the record as a whole' including any new evidence

that the Appeals Council 'specifically incorporated ... into the administrative record.'"[8]

*Meyer v. Astrue,* 662 F.3d 700, 704 (4th Cir. 2011) (remanding for rehearing pursuant

to sentence four of 42 U.S.C. § 405(g)) (quoting *Wilkins v. Sec'y, Dep't of Health and*

*Human Servs.,* 953 F.2d 93, 96 (4th Cir. 1991) (internal marks omitted); *see also*

*Snider,* 2013 WL 4880158, at *5 ("[W]here a claimant has submitted additional

evidence to the Appeals Council, and the Appeals Council considered that evidence and

---

[8] The Commissioner argues that Claimant cannot rely on the mental health records submitted after the ALJ's decision because they are neither "new" nor "material," and they were not available to the ALJ. The undersigned rejects this argument in light of the Appeals Council's express incorporation of the records into evidence. By adding the additional mental health records and considering them as part of the request for review, the Appeals Council implicitly conceded that the documentation was new, material, and relevant to the disability decision at hand. *See Snider*, 2013 WL 4880158, at *5 (finding that by considering newly-submitted medical evidence, the Appeals Council "necessarily considered the evidence new and material, and that it related to the period on or before the date of the ALJ's decision."); *see, also, Gentry v. Colvin,* No. 2:13-CV-66-FL, 2015 WL 1456131, at *2-3 (E.D.N.C. Mar. 30, 2015); *and Smith v. Colvin,* C/A No.: 1:14-cv-0489 DCN, 2015 WL 1263040, at *18 (D.S.C. Mar. 18. 2015). Furthermore, the fact that the incorporated records were not reviewed by the ALJ does not prevent their consideration by the Court. *Id.* Therefore, the undersigned **FINDS** that in light of the Appeals Council's incorporation of the mental health records into evidence, the task before the Court is not to determine whether the mental health records are new and material, but rather, to review the record as a whole, including the documents accepted by the Appeals Council, to determine if the Commissioner's decision is supported by substantial evidence.

made it part of the record, this Court must review the record as a whole, including the new evidence, to determine whether substantial evidence supports the Commissioner's findings."). If the final decision is not supported by substantial evidence, or was reached through an incorrect application of the law, the Court may, under sentence four, "enter, upon the pleadings and transcript of the record, a judgment ... modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." *See* 42 U.S.C. § 405(g).

The Commissioner contends that Claimant is not entitled to a reversal and remand because he "has not identified any credible functional limitations that would preclude him from performing the unskilled jobs identified by the vocational expert." (ECF No. 15 at 10). The undersigned disagrees with this statement. At the administrative hearing, the ALJ posed a hypothetical question to the vocational expert ("VE") that included some non-exertional mental limitations. Although the precise foundation for the mental limitations included by the ALJ is unclear, the ALJ engaged in the following exchange with the vocational expert:

> ALJ: Now, what I'd like you to do is take the first hypothetical that I gave you with the physical limitations and add to that that the individual is limited to performing simple, routine and repetitive tasks with no fast pace or strict production requirements, with occasional changes in the work setting, occasional decision making and occasional interaction with coworkers and the public. Would there be jobs that an individual with these additional limitations could perform?"
>
> VE:    Yes, your honor ...

(Tr. at 72). However, when the ALJ added another limitation that presumed the hypothetical individual would be "off task due to the side effects of medication for two hours during the workday," the VE responded that the individual would not be able to perform any of the jobs previously cited. (Tr. at 73-74). Likewise, as set forth below,

when Claimant's representative posed a hypothetical question to the VE that incorporated the opinions of Drs. Worthington and Gray, the VE once again testified that such an individual would not be able to do any work.

> REP:  Okay. And if we took the Judge's first hypothetical and added in the following non-exertional limitations. And I'm taking these – the RFCs, Your Honor, from both Mr. Gray and Dr. Worthington are very similar, so I'm just going to take the marked restrictions ... And, and, Mr. Michael, I'm defining  marked as a serious limitations [*sic*] in such that the ability to function is severely limited in these following areas.

> VE:    Uh-huh.

> REP: The, the ability to interact with supervisors and coworkers, the ability to deal with work stress --

> VE:    Right.

> REP: -- the ability to deal with the public, which I believe the Judge addressed at a later hypothetical, and to behave in an emotionally stable manner. How would marked limitations in those areas in your opinion impact one's ability to maintain unskilled entry-level jobs?

> VE:    In my opinion the individual would not be able to do that, to do any work.

(Tr. at 74-75). Accordingly, whether Claimant is capable of doing the jobs cited by the ALJ depends upon the limitations of mental functioning that are included in the RFC finding, and the severity of those limitations. At the time of the written decision, no mental limitations were included in the RFC finding; thus, Claimant was capable of performing all of the jobs cited by the VE. However, if the opinions of Dr. Gray and Dr. Worthington had been given controlling weight and incorporated in the RFC finding, Claimant would have been unable to do any of the jobs cited by the ALJ. The effect on the disability determination of incorporating some, but not all, of the limitations found by Dr. Worthington and Dr. Gray remains unresolved. For that reason, an appropriate assessment of the medical source opinions is key to a fair resolution of this case.

In summary, the ALJ initially erred at the second step of the sequential process by failing to address Dr. Gray's and Dr. Worthington's findings that Claimant had multiple moderate and marked limitations in mental functioning, and further erred by failing to reconcile those findings with his conclusion that Claimant's mental impairments were non-severe. This error was carried over to the ALJ's RFC analysis, resulting in the absence of limitations in the RFC finding to account for Claimant's mental impairments. Although the ALJ might have corrected the error when he queried the VE, he provided no basis for the specific mental limitations he included in two hypothetical questions posed. Moreover, while he received an answer to one of the two hypothetical questions that supported his decision, he received an opposite answer to the second hypothetical question. Similarly, when Claimant's representative questioned the VE about a hypothetical individual with all of the limitations identified by Drs. Worthington and Gray, the VE confirmed that Claimant was disabled. Accordingly, the question of what, if any, jobs can be performed by Claimant when his mental impairments are properly taken into account is left unanswered. Finally, when Claimant submitted records to the Appeals Council, which, if nothing else, verified that Dr. Gray was a treating source—thus calling into question one of the ALJ's primary reasons for a wholesale rejection of Dr. Gray's opinions—the Appeals Council failed to acknowledge the need for a reconciliation of the conflicts in the record. In light of these unresolved conflicts, the undersigned **FINDS** that the decision of the Commissioner is not supported by substantial evidence and should be reversed and remanded for further assessment of Claimant's mental impairments and their effect on his ability to work. *See Bratton v. Colvin,* No. 7:13cv00421, 2015 WL 1275181, at *6 (Mar. 19, 2015) ("Courts ... review[] the record as a whole to determine if the new evidence is contradictory,

presents material competing testimony, or calls into doubt any decision grounded in the prior medical reports. If the new evidence creates ... a conflict, there is a reasonable possibility that it would change the outcome of the case, and the case must be remanded to the Commissioner to weigh and resolve the conflicting evidence.").

## VIII.   **Recommendations for Disposition**

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **GRANT** Plaintiff's request for a remand, (ECF No. 12); **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 15); **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings to re-evaluate the severity and functional effects, if any, of Claimant's mental impairments; and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de*

36

*novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Copenhaver and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED**:  August 21, 2015

Cheryl A. Eifert
United States Magistrate Judge